In the matter of the application of the WEST JERSEY TRAC-
TION COMPANY to define the mode of crossing the line of
the West Jersey and Seashore Railroad Company line, in
the borough of Haddonfield, in the county of Camden and
State of New Jersey.

[Filed January 4th, 1900.]

1. On an application to define the mode of crossing a steam railroad by a
trolley road, a map filed by the petitioner, showing that the route of a trolley
road crosses the railroad at the point where the mode of crossing is to be de-
fined, is sufficient, though it does not exhibit any indication of a crossing.

2. It will be presumed, in the absence of proof, that an instrument bearing
the seal of a corporation, and the signature of its secretary and solicitor, was
signed and sealed by proper authority.

3. The adoption of a resolution by the board of directors of a corporation,
reciting that an act of its secretary and solicitor was done with their acqui-
escence, and that they ratified it, is equivalent to an original authorization.

4. Under *Pamph. L. 1852 p. 263*, requiring a railroad company to construct
bridges or passages over or under its railroad where any "roads shall cross
the same and to alter and grade the said roads so that carriages, horses and
cattle, passing and repassing, shall not be impeded thereby," the railroad has
the right to cross a highway at grade.

5. On an application to define the mode of crossing a railroad by a trolley
line, the question is whether, taking into account the danger of collision, and
facility and economy with which it may be avoided by adopting a crossing
other than at grade, the latter method should be required.

On final hearing.

*Mr. E. Ambler Armstrong* and *Mr. David J. Pancoast*, for
the petitioner.

*Mr. Joseph H. Gaskill* and *Mr. Herbert A. Drake*, for the
West Jersey and Seashore Railroad Company.

REED, V. C.

The West Jersey Traction Company, which operates a trolley
line, filed a petition in this court asking this court to fix the

manner in which it should cross the tracks of the West Jersey and Seashore Railroad Company, in the borough of Haddonfield.

An answer to the petition has been filed by the latter company.

It is objected *in limine* that the map of the route as filed by the petitioner, does not show that the route crosses the West Jersey and Seashore Railroad Company. What is meant by this objection is that the map does not exhibit any indication of a crossing.

But the map shows that its route runs across the right of way of the steam road at the point where the mode of crossing is to be defined. This is all that is essential.

It is next objected that the application to this court was not made by the West Jersey Traction Company, but was in fact made by the Camden and Suburban Railroad Company, which owns a majority of the stock of the former company. The purchase of the stock occurred in April, 1896, since which time there seems to have been no books of account kept by the West Jersey Traction Company, which company was leased to the Camden and Suburban Railroad Company. The petition is over the seal of the West Jersey Traction Company and signed by its secretary and solicitor. This raises the presumption that the seal was affixed by proper authority. *Leggett* v. *New Jersey Manufacturing Co., Sax. 541; Manhattan Manufacturing Co.* v. *New Jersey Stock Yard Co., 8 C. E. Gr. 165.*

But it is said that this *prima facie* presumption is rebutted by proof of the want of corporate authority to fix the seal and execute the corporate act; that the minute-book of the petitioners fails to show that William Browning was authorized to attach the seal of the company to the present petition.

But by a resolution appearing in the book under date of September 11th, 1899, after the filing of the petition, it is recited that Browning did the act with the acquiescence of the directors who ratified his act.

This adoption of the act of the secretary was, I think, equivalent to an original authorization. *Kountze* v. *Morris Aqueduct Co., 29 Vr. 303; S. C., 695.*

The main question is in respect to the manner in which the trolley road should cross the steam road.

It is insisted by the counsel of the trolley road that the steam road is itself illegally crossing a highway at grade and that the trolley has the right to use the surface of the highway in the same manner as any other vehicle.   The duty of the steam road to elevate or depress its tracks so as to leave the surface of the highway free for the passage of vehicles, horses, &c., is put upon the provision of the ninth section of the charter of the Camden and Atlantic Railroad Company (*Pamph. L. 1852 p. 268*):

"That it shall be the duty of the said company to construct and keep in repair good and sufficient bridges or passages over or under said railroad where any public or other roads shall cross the same, and to alter and grade the said roads so that the passage of carriages, horses and cattle passing and repassing shall not be impeded thereby."

Similar provisions are to be found in other charters of steam roads, and I am not aware that it has ever been held that this provision compelled the railroad to elevate its tracks so that it shall not cross public roads at grade.   Railroads pass over public roads when they cross at grade.   The act compels the railroad to conform the surface of the highway to the surface of the railroad, so as not to impede the passage of cattle and horses over the railroad, and this is all.   This has always been the practical construction of these provisions.   The railroad then has the right to cross the highway at grade.

The question then is whether the trolley shall be compelled to cross the railroad otherwise than at grade.

No one suggests that it should be compelled to build a structure which will permit the passage of the trolley cars above the railroad tracks.

The insistence is that it should build a tunnel so as to permit its cars to pass underneath the railroad.  The argument in favor of such a crossing is grounded upon the danger of collision which will arise from a grade crossing.   It cannot be denied that there is an element of danger in every grade crossing of a

steam railroad. Every public road that crosses a steam road at grade presents a point of possible peril. If all persons were constantly vigilant danger would disappear or be reduced to infinitesimal proportions. So long, however, as men are careless, as they always will be, the instances of collision on grade crossings will engage the attention of courts and create the wish that grade crossings may be abolished. The policy of the state in fostering the building of railroads as instruments for the transportation of persons and merchandise has not required elevated or underground crossings. The expense which would attend the construction of railroads, if so compelled, would be a practical prohibition against the opening up of new sections of the country by new railroads. So grade crossings have been permitted, and where such crossings are, by their environments, exceptionally perilous, such dangers have been guarded against by such provisions as gates, flagmen and signals.

It cannot be said, therefore, that because there is an element of danger in a grade crossing, some other method is to be provided. The question is whether, taking into account the degree of such danger in the particular instance, and also the facility and economy with which such danger may be avoided by adopting some crossing other than at grade, the latter method should be required. The statute in the present case fixes the conditions upon which a crossing other than at grade may, in the discretion of the chancellor, be ordered, namely, first, when such other method is reasonably practicable, and second, where the public safety so requires. The discretion of the chancellor must be controlled by the conditions attending the particular crossing.

At the point where the present trolley road crosses the steam road, there passes and repasses along the main street, over the steam road, five hundred and thirty-five wagons every twenty-four hours. Now, it is said that a trolley car is a vehicle, having a right to use the surface of the highway, without compensation, because it is a vehicle. It is urged that if these five hundred and thirty-five wagons pass each day at grade, why cannot the trolley cars of the trolley company do the same?

If the motive power which propels these cars was as certain and continuous in its operation as the motive power which propels the wagons, this argument would be sound. But it is not.

The evidence shows conclusively that, from causes therein stated, the power is liable to be interrupted at any moment. Nor am I satisfied that the momentum acquired by a car, before reaching the track, can be safely relied upon to carry the car completely over the track or tracks, for if, while acquiring this momentum, the power should be withdrawn at a critical point, too late to stop the car before reaching the track, it would be left helpless in the path of danger. While such an occurrence may not happen for months or years, yet it is proved that collisions have occurred, and they will occur until a safer method of propulsion is discovered. The query is now whether the conditions here are such as to so increase the likelihood of such an occurrence as to impose upon me the duty of advising an underground crossing. In three instances I have advised a grade crossing of a railroad by a trolley line. In each of these the conditions were unlike the present. In two the railroad crossed was used infrequently by freight trains running along at a slow rate of speed. In the other the trains were few, with a station at which all the passenger trains come to a stop within a short distance from the point of crossing.

In the *New York and Long Branch Railroad Co.* v. *Atlantic Highlands, &c., Railway Co., 10 Dick. Ch. Rep. 522,* the chancellor ordered a grade crossing. In that case ninety trains passed over the railroad at that point, several of them at high speed and without stopping. The underground crossing there proposed would require a change in the grade of two streets and an expenditure of between $60,000 and $70,000, and also subject the company to the payment of damages to the owners of property which bordered upon the streets. The depression of the street would have materially interfered, also, with the facility of approach from the street to the station of the steam railroad and would have caused considerable inconvenience to the public. Under these conditions the chancellor coupled with his permission to cross at grade the duty of maintaining a towerman with a Gibbs signal system.

In this case there are in summer seventy-two regular trains and sometimes thirty special trains running over the steam road. Of these forty stop at Haddonfield station, near the point of crossing, four of which are freight trains. The remainder of the one hundred and two trains are fast trains running between Camden and Atlantic City, crossing Main street, Haddonfield, at a speed of from forty to sixty miles an hour. To the south from this crossing there is a view of the track of from one-half to three-quarters of a mile.

An undergrade crossing can be built fourteen feet in width for $12,653. The slope of the street favors an undergrade crossing, as there is a rise towards the steam railroad tracks from each side. Only fourteen feet of the street need be depressed, and on each side of an iron railing fencing the tunnel there would be ample room for the passage of vehicles, because Main street is an exceptionally wide avenue. Therefore, no material inconvenience would result to those using the street in going to and from the station of the steam railroad.

Under these conditions, in my judgment it is reasonably practicable to avoid a grade crossing, and I think that public safety requires it. The details in respect to the undergrade tunnel will be fixed upon the framing of the decree.